UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JOHNSON & JOHNSON and JOHNSON & JOHNSON  :
CONSUMER COMPANIES, INC.,                :
                        Plaintiffs,      :        06 Civ. 8209 (DLC)
                                        :
            -v-                          :        CORRECTED
                                        :        OPINION AND ORDER[*]
ACTAVIS GROUP hf and ACTAVIS, INC.,      :
                        Defendants.      :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
Mark N. Mutterperl
Anita Tucker Smith
Jessica S. Parise
Fulbright & Jaworski LLP
666 Fifth Avenue, 31st Floor
New York, NY 10103

For Defendants:
Lauren S. Albert
Axinn, Veltrop & Harkrider LLP
1370 Avenue of the Americas
New York, NY 10019

James D. Veltrop
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103


DENISE COTE, District Judge:

        This litigation raises the question of whether private

label sellers may imitate the packaging of brand-name products

---
[*] This Corrected Opinion revises the discussion of the survey
conducted by Dr. Alex Simonson, both in the text and at note 6.

which are sold side-by-side.  Plaintiffs Johnson & Johnson and

Johnson & Johnson Consumer Companies ("J&J") have moved for

partial summary judgment on their Lanham Act and New York State

Law claims in this action against Actavis Group hf and Actavis,

Inc. ("Actavis").  For the reasons stated below, summary

judgment is granted to J&J on Actavis's functionality defense,

but is otherwise denied.


BACKGROUND

    J&J sells the antibiotic ointment and cream NEOSPORIN®.

NEOSPORIN® is packaged in a box and tube that J&J asserts is

distinguished by a gold/yellow background, a green color and

particular typeface for the brand name, and a curving arrow in

the gold/yellow color.[1]  Through this motion, however, it seeks

summary judgment on the background color alone, which it

identifies as its Signature Gold Mark ("Gold Mark").  This color

mark is unregistered, but J&J asserts that the mark has acquired

secondary meaning and is entitled to protection.

    Actavis manufactures private label antibiotic ointment and

cream for many retailers, including such national retailers as

CVS and Walgreens.  Several of its customers have designed

---

[1] The gold/yellow color is Pantone color 136.  J&J asserts that
it has used the color on NEOSPORIN® packaging since at least
1984, but Actavis argues that the exact shade of yellow changed
many times prior to 2002.

packaging that use a gold/yellow background color identical or virtually indistinguishable from the Gold Mark. While such packaging has been present in the marketplace for years, it has become more prominent in recent years, and was adopted by CVS and Walgreens for their private label antibiotic ointments in 2005. Actavis explains that its customers have designed their private label packaging generally, and for antibiotic creams in particular, to mimic that of national brand equivalents in order to "make it easier for their consumers to compare" the products.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

J&J has moved for summary judgment on trademark and trade dress infringement claims pleaded under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); on the deceptive trade practices claim pleaded under New York General Business Law

§ 349; on the trademark dilution claim pleaded under New York
General Business Law § 360-1; on claims of unfair competition
and unjust enrichment pleaded under the common law of the State
of New York; and on Actavis's affirmative defenses of laches,
acquiescence and estoppel.[2]  As noted, J&J has moved for partial
summary judgment with respect to its Gold Mark alone.  Its
motion on the Lanham Act claims is further limited to the theory
of initial interest confusion.

I.   Lanham Act

     To prevail on a Section 43(a) claim, J&J must show, first,
that its mark is entitled to protection and, second, that
Actavis's use of the mark is likely to cause confusion.  <u>Louis
Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 454 F.3d 108, 115
(2d Cir. 2006).  Disputed issues of fact exist with respect to
both required showings.

     A. Rights in the Gold Mark

     A color mark is only entitled to protection if it has
acquired secondary meaning.  <u>Id.</u> at 116.  Secondary meaning "is
a term of art referencing a trademark's ability to identify the
source of the product rather than the product itself."  <u>ITC Ltd.</u>

---

[2] The claims are, respectively, those pleaded in the first,
second, fifth, sixth, seventh, and eighth causes of action.
Although these include claims for several violations of New York
law as well as violation of the Lanham Act, the parties' briefs
specifically analyze only the Lanham Act claim, the New York
trademark dilution claim, and Actavis's affirmative defenses.

v. Punchgini, Inc., 482 F.3d 135, 167 (2d Cir. 2007) (citation omitted).  Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."  Genessee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997) (citation omitted).  The careful weighing of evidence necessary to determining secondary meaning often renders this prong of a Lanham Act claim an unlikely candidate for summary judgment. See Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 169 (2d Cir. 1991).

There are disputed issues of fact as to whether the Gold Mark has acquired secondary meaning.  Much of the evidence on which J&J relies to establish secondary meaning in the Gold Mark could be used as well to show consumer recognition of the NEOSPORIN® brand name, which is indisputably a strong mark in its own right.  This includes the product's sales success and advertising expenditures.  Indeed, the advertising for the product emphasizes the brand name, and does not always emphasize or even include the Gold Mark.  Although J&J is correct in asserting that its advertising need not explicitly direct the consumer's attention to the mark to constitute evidence of

secondary meaning, <u>see, e.g.</u>, <u>Centaur Commc'ns, Ltd. v. A/S/M</u>
<u>Commc'ns, Inc.</u>, 830 F.2d 1217, 1222-23 (2d Cir. 1987),
advertisements are only relevant here to the extent they feature
the Gold Mark and, thus, serve to link the NEOSPORIN® brand with
the gold/yellow background color of its packaging.

The facts presented with respect to the other factors used
in determining secondary meaning are also in dispute. For
example, J&J relies on a survey conducted by the market research
firm Guideline[3] to support its contention that the Gold Mark has
acquired secondary meaning. It asserts that 54.6% of consumers
in the study named NEOSPORIN® as a source of the product sold in
a box bearing only the Gold Mark. But only 34% of consumers in
the study named NEOSPORIN® as the only ointment sold in a
package like the one they were shown. This percentage fell to
32% when the results from the control group were considered.
Actavis further contends that the 32% figure is itself inflated
because of flaws in the design of the survey. Actavis also
points to studies conducted by Pfizer, a prior owner of
NEOSPORIN®, in connection with advertising recalls of their
products which could be read to show low consumer recognition of
the Gold Mark. Taken as a whole, while J&J's evidence of
secondary meaning is sufficient for a jury to conclude that the

---

[3] Actavis refers to this survey as the Hal Poret study.

Gold Mark has acquired distinctiveness in the marketplace, it is insufficient to establish secondary meaning as a matter of law.

J&J is entitled to summary judgment, however, on one aspect of its motion: Actavis's defense that the Gold Mark is functional. No mark is entitled to protection if a company's "competitors must be able to use [it] in order to effectively communicate information regarding their products to consumers." Star Indus., Inc. v. Baccardi & Co. Ltd., 412 F.3d 373, 382 (2d Cir. 2005). Thus, even if a mark is shown to have acquired secondary meaning, proof that the mark is functional will preclude protection. The burden of proving functionality rests on the defendant. Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1006 (2d Cir. 1995).

A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 32 (2001) (citation omitted). For aesthetic rather than utilitarian product features, it is relevant to consider whether protecting the feature from infringement will place competitors at a "significant non-reputation-related disadvantage." Id. at 33. "Although sometimes color plays an important role (unrelated to source identification) in making a product more desirable, sometimes . . . color is not essential to a product's use or purpose and

does not affect cost or quality." <u>Qualitex Co. v. Jacobson</u>
<u>Prod. Co.</u>, 514 U.S. 159, 165 (1995).  When color is not
essential in that way, the doctrine of functionality will not
bar protection for color.  <u>Id.</u>  In other words, when color
serves as a symbol to identify the source of the product and
does not serve any other significant function, then it is
protectable.  <u>Id.</u> at 166.  Thus, "[t]he ultimate test of
aesthetic functionality . . . is whether the recognition of
trademark rights would significantly hinder competition." <u>Id.</u>
at 170 (citation omitted).

   J&J has presented compelling evidence that the Gold Mark is
not functional.  Among other things, antibiotic ointments such
as Polysporin come in boxes that do not use the Gold Mark.
Actavis itself manufactures an antibiotic ointment for Wal-Mart
that is sold in predominantly white packaging.  Other colors,
such as blue, white, and orange are prevalent in the packaging
of first-aid products that are customarily sold in the aisle in
which NEOSPORIN® and the Actavis products are found.

   Apart from pointing generally to other first-aid products
that incorporate some shade of yellow as one of the components
of their packaging, including one line of the Bacitraycin Plus
brand of antibiotic ointments, Actavis rests its functionality
defense principally on the packaging of Band-Aid brand

antibiotic bandages.[4]  The box features a gold-colored drop meant to denote the antibiotic.  As Actavis acknowledges, however, the ointment is actually white, not gold/yellow, and the colored drop is merely an aesthetic, not a utilitarian, feature.  The fact that one brand of bandages uses a color to depict a drop of ointment that is similar to the Gold Mark used as a background color on the NEOSPORIN® packaging is insufficient for a jury to conclude that the Gold Mark is functional when used to sell antibiotic ointment.  Actavis has simply failed to present sufficient evidence from which a jury could conclude that protection of the gold/yellow color would significantly hinder competition in antibiotic ointments.  J&J is, therefore, entitled to summary judgment on Actavis's functionality defense.

B. Likelihood of Confusion

Because there are disputed issues of fact as to whether the Gold Mark has acquired secondary meaning, J&J would not be entitled to summary judgment on its Lanham Act claims even if it were able to show a likelihood of confusion as a matter of law.  As it is, however, there are disputed issues of fact here as well which require a trial.  As noted, J&J's summary judgment motion relies solely on a theory of initial interest confusion.[5]

---

[4] The Band-Aid brand is, at present, owned by J&J, but it uses an ointment made by Actavis for the bandages.

[5] Actavis argues that J&J's initial interest theory and its focus on the Gold Mark constitute a new infringement claim not pled in

Likelihood of confusion is critical to the success of infringement claims under § 43(a) of the Lanham Act. There is "an essential distinction," however, "between a deliberate attempt to deceive and a deliberate attempt to compete. Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted." George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1541 (2d Cir. 1992) (citation omitted). Infringement requires "a probability of confusion, not a mere possibility." Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir. 1998). It is well-established that "point-of-sale confusion is not the only confusion which the Lanham Act seeks to prevent; other forms of confusion, including . . . initial interest confusion . . . may also be actionable." Louis Vuitton Malletier v. Burlington Coat Warehouse Corp., 426 F.3d 532, 539 n.4 (2d Cir. 2005).

Initial interest confusion aims at "the probability that potential purchasers [will] be misled into an initial interest in" the junior user of a mark, even if consumers are no longer confused when they make the purchase. Mobil Oil Corp. v.

the complaint. Actavis's protest is unavailing because "federal pleading is by statement of claim, not by legal theory." Wynder v. McMahon, 360 F.3d 73, 77 (2d Cir. 2004) (citation omitted). Initial interest confusion is merely a form of confusion actionable under § 43(a) of the Lanham Act. J&J's complaint adequately pleads its § 43(a) claim and specifically references the "NEOSPORIN Signature Gold Mark."

Pegasus Petroleum Corp., 818 F.2d 254, 260 (2d Cir. 1987). The theory has traditionally been used where the consumer is introduced to the junior user's product alone, such that the similarity between marks may help the junior user gain "crucial credibility during the initial phases" of a purchasing decision. Id. at 259. For example, in Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons, 523 F.2d 1331 (2d Cir. 1975), the court found that the defendant's "Grotrian-Steinweg" mark for its pianos was so similar to the Steinway mark that it could mislead potential Steinway customers "into an initial interest" in the Grotrian-Steinweg brand because they believed it was connected to Steinway, even if the customers realized upon additional investigation that no such connection existed. Id. at 1341. Similarly, the court in Mobil Oil Corp., 818 F.2d at 254, explained that the defendant's name "Pegasus" evoked the image of a flying horse like the one used by Mobil for its mark and, therefore, potential purchasers may be misled into listening to the defendant's marketing calls. "Such initial confusion works a sufficient trademark injury," even if oil traders realized by the time they entered into any deals that no connection existed between the companies. Id. at 260.

In this case, the senior and junior user's products are displayed side-by-side, but J&J argues that initial interest confusion may nonetheless occur here as well. It contends that

11

Actavis's use of the Gold Mark will attract consumers who may otherwise never examine the store-brand product. See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, --- F.3d ----, No.07-2644, 2007 WL 4478981 (3d Cir. Dec. 24, 2007) (reversing in part denial of a preliminary injunction for packaging of store-brand artificial sweetener). Therefore, in the event J&J succeeds in showing a likelihood of initial interest confusion, it may prove a violation of § 43(a).

In assessing the likelihood of confusion in this case, the fact finder will have to consider "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Savin Corp. v. Savin Group, 391 F.3d 439, 456 (2d Cir. 2004) (citation omitted). Likelihood of confusion is analyzed under a "non-exclusive multi-factor test" provided in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961), which includes: "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers." Dooney & Bourke, 454 F.3d at 116. "No single factor is dispositive, nor is a court limited to

consideration of only these factors." Id. at 118 (citation omitted). Rather, the court's focus must remain "on the ultimate question of whether consumers are likely to be confused." Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005) (citation omitted).

Three of the above factors -- the proximity of the products, the likelihood of J&J's bridging the gap, and the quality of Actavis's products -- are not in dispute. The parties concede that the products are sold next to each other; there is no gap here because the products compete directly; and J&J admits that quality is not at issue. As the discussion below illustrates, however, disputed issues of material fact remain with respect to the other Polaroid factors. "If a factual inference must be drawn to arrive at a particular finding on a Polaroid factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 215 (2d Cir. 2003) (citation omitted).

1. Strength of the Gold Mark

The first Polaroid factor weighs a mark's "tendency to uniquely identify the source of the product." Star Indus., 412 F.3d at 384. "This tendency is strong to the extent that the mark is distinctive . . . by virtue of having acquired secondary

meaning." Id. For the reasons discussed above, there are disputed issues of fact as to whether the Gold Mark has acquired secondary meaning.

2. Similarity of the two marks

For the second factor, "[i]n assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Id. at 386 (citation omitted). For instance, even if the marks at issue contain similarities, the "prominent use of [a] well-known house brand . . . significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (affirming summary judgment for defendant where use of house marks reduced likelihood of confusion).

In this case, J&J challenges multiple private label products manufactured by Actavis for several retailers, each with its own packaging designs. The contextual and fact-intensive inquiry required under this factor means that it cannot reasonably be resolved without a product-by-product and retail setting-by-retail setting analysis. The parties have not undertaken such an approach in their submissions, and the

comparisons that they do make create issues of fact that require a trial.

3. Actual confusion

"[A]ctual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." Savin Corp., 391 F.3d at 459 (citation omitted). Nonetheless, "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." Id. (citation omitted). Customary ways of showing actual confusion include direct consumer testimonials or consumer surveys. See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001).

J&J has not presented any evidence of actual confusion, either anecdotally or through a survey. Instead, J&J has relied essentially on CVS market research that preceded that store's decision to change its packaging to imitate NEOSPORIN®'s trade dress. This focus group research, as interpreted by J&J, shows that consumers are drawn to the store-brand product by the similarity of its packaging to that of the national brand. J&J also points to certain statements by some of the study's participants suggesting that similarities in packaging could cause other people to confuse the store-brand product with the national brand or to think they are made by the same

manufacturer.  The responses that J&J cites do not, however, indicate that the participants themselves confused the store brands with national brands.  Moreover, the CVS study was not limited to antibiotic ointments.

In contrast, Actavis has offered substantial expert evidence that no confusion exists.  A survey conducted by J&J's expert Dr. Alex Simonson compared, <u>inter alia</u>, the time consumers needed to identify NEOSPORIN® correctly when it was displayed next to "infringing" CVS packaging with the time they needed when it was displayed next to the older, non-infringing CVS packaging.  There was no statistically significant difference in those response times.[6]  Actavis also presents four surveys conducted by its own expert, Dr. Itamar Simonson, to measure the likelihood of consumer confusion between the CVS, Walgreens, Pathmark, and Rite-Aid private label products with NEOSPORIN®.  The survey results again showed no statistically reliable evidence of a likelihood of confusion.[7]

---

[6] J&J argues that Actavis has improperly relied on this portion of Dr. Alex Simonson's survey because participants were shown the CVS products and were asked questions about them well before they were asked to pick out NEOSPORIN® from a display of multiple products.  J&J also asserts that a survey participant's speed in locating NEOSPORIN® does not inform the question of whether shoppers are first drawn to the store brand because of the similarity in color.

[7] As J&J points out, Dr. Itamar Simonson admitted that these four surveys tested for point-of-sale confusion and not initial interest confusion.  J&J also argues that the surveys contained several biases, including that they sampled only customers who

J&J's failure to present its own consumer survey weighs strongly against a finding of actual confusion.  See Star Indus., 412 F.3d at 388.  Likelihood of confusion has, however, been found even in cases where no surveys had been conducted by the plaintiffs.  E.g., Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78-79 (2d Cir. 1988) (entering a preliminary injunction); Centaur, 830 F.2d at 1227 (entering judgment).  While Hasbro and Centaur each observed that a negative inference against the plaintiff would be inappropriate given the brief time the products were in competition in the marketplace, that reasoning would explain the absence of anecdotal evidence, but not the absence of survey evidence.  Here, of course, at least some of the private label products have been in the marketplace for a considerable amount of time and J&J's failure to offer either anecdotal evidence or surveys is appropriately considered alongside Actavis's surveys.

4. Good faith

In the trademark context, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."

---

had purchased antibiotic ointment in the subject stores in the preceding year and who expected to do so again at the same stores, and that the surveys were structured so as to draw respondents' attention to the store-brand name.

Id.  "[I]n the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying."  Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1005 (2d Cir. 1997).  Indeed, "copying in order to market a functionally equivalent alternative product might well benefit consumers."  Id.

The parties debate the relevance of the retailers' bad faith in choosing to emulate the Gold Mark when evaluating a Lanham Act claim brought solely against the manufacturer and not the retailers.  It is undisputed that the retailers whose actions are highlighted in these motions, such as CVS and Walgreens, chose the background color for their packaging to mimic plaintiff's trade dress.  To the extent that J&J is able to show that a retailer engaged in bad faith copying, i.e., that it intended to confuse consumers through the design of its packaging, that bad faith may with the appropriate evidence be imputed to Actavis.  "[I]f a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."  Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 854 (1982).  Thus, a defendant's bad faith can be shown even where it did not create the

infringing trade dress.  See Paddington Corp. v. Attiki Imp. &
Distrib., Inc., 996 F.2d 577, 587 (2d Cir. 1993).

Whether Actavis and its customers intended to create
confusion or merely to help consumers find store-brand
equivalents is a determination that will have to be made by the
finder of fact at trial.  Actavis will not be able to prevail
with respect to this issue, however, simply by showing that the
retailer directed Actavis to copy the Gold Mark.

5. Consumer sophistication

Finally, consumer sophistication is determined from "the
general impression of the ordinary purchaser, buying under the
normally prevalent conditions of the market and giving the
attention such purchasers usually give in buying that class of
goods."  Star Indus., 412 F.3d at 390 (citation omitted).  It
may be shown through surveys, expert opinion, or simply evidence
of the circumstances in which a consumer typically encounters
the product.  Id.

As with many of the other factors, the parties dispute this
question of fact and reasonable juries could reach differing
conclusions.  They point to consumers' familiarity with some of
the private label brands that are at issue here, typical
patterns used to display the competing products in some of the
retailers' stores, and the circumstances in which consumers
choose to purchase an antibiotic cream.

In sum, disputed issues of material fact remain with respect to five of the eight Polaroid factors. J&J is not, therefore, entitled to summary judgment on the likelihood of confusion prong of its Lanham Act claims. A trial is needed to determine whether the Gold Mark has acquired secondary meaning as well as to resolve the likelihood of confusion.

## II. New York Dilution Claim

J&J also moves for summary judgment on its claim brought under New York State dilution law, proceeding on the theory that the copying of the Gold Mark has led to blurring.[8] Section 360-l of the New York General Business Law provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360-l. "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning." N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002). Where a mark is protected, the only remaining question is whether there is a "likelihood of dilution." Id.

---

[8] J&J concedes that it is not entitled to summary judgment on its claim brought under the 2006 Trademark Dilution Revision Act, 15 U.S.C. §1125(c), which requires proof that a mark is famous.

Dilution by blurring "occurs where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Id. at 558 (citation omitted). Several factors are considered in determining the likelihood of blurring, including: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." Id.

For the reasons discussed with respect to the Lanham Act claim, there are disputed issues of fact as to whether the Gold Mark has acquired secondary meaning and whether J&J can establish a likelihood of blurring. Summary judgment is, therefore, inappropriate on this claim as well.[9]

III. Affirmative Defenses

Finally, J&J moves for summary judgment on Actavis's affirmative defenses of laches, acquiescence, and estoppel. The defendant's use of the Gold Mark stretches back until at least 2001, and yet J&J did not bring suit until 2006.

---

[9] As Actavis correctly observes, a judgment in J&J's favor on a New York law claim will only reach those activities of the defendant and its sales within New York State.

It has long been "held in the context of trademark actions that where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer, or acquiesces in the latter's use, a court of equity has the discretionary power to deny injunctive relief or an accounting." ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 67 (2d Cir. 2002) (citation omitted). To succeed on the equitable defense of laches, a defendant "must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (citation omitted). Fairness is central to the availability of the laches defense. "A party asserting a laches defense must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 2003) (citation omitted).

In contrast to laches, which reflects passive consent, the defense of acquiescence embodies active consent. Proof of acquiescence includes a showing that: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the

delay caused the defendant undue prejudice." ProFitness

Physical Therapy Ctr., 314 F.3d at 67 (citation omitted).

"Active consent is implied by conduct on the plaintiff's part

that amounts to an assurance to the defendant, express or

implied, that the plaintiff would not assert his trademark

rights against the defendant." Id. at 68 (citation omitted).

Finally, to succeed on the defense of equitable estoppel,

defendants must establish three elements. These are: "(1) a

misrepresentation by the plaintiff, (2) reasonable reliance by

the defendant, and (3) prejudice." Veltri, 393 F.3d at 326.

Equitable estoppel may also be found when the plaintiff has been

silent in circumstances where there was a reasonable expectation

that an injured plaintiff would assert its rights. See id.;

Gen. Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45-46

(2d Cir. 1994).

Some delay in bringing suit may, however, be excused by the

doctrine of progressive encroachment. "Although a plaintiff

cannot simply sleep on his rights, he has no obligation to sue

until the likelihood of confusion looms large and his right to

protection [has] clearly ripened." ProFitness Physical Therapy

Ctr., 314 F.3d at 68 (citation omitted). The doctrine of

progressive encroachment rests on the reasoning "that a

plaintiff should not be obligated to sue until its right to

protection has ripened such that plaintiff knew or should have

known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant." Id. at 70. That is, a plaintiff may delay in bringing suit until there is a likelihood of confusion due to the infringer's activities in the marketplace. Id.

Because monetary awards provided by the Lanham Act are "subject to the principles of equity," the equitable defenses of laches, acquiescence, and estoppel may be relied upon in this case to bar monetary as well as injunctive relief. 15 U.S.C. § 1117 (2004); see Grotrian, 523 F.2d at 1344. Even where an equitable defense would bar an accounting of the defendant's profits,[10] however, "a court may nonetheless grant injunctive relief if it determines that the likelihood of confusion is so great that it outweighs the effect of plaintiff's delay in bringing suit." ProFitness Physical Therapy Ctr., 314 F.3d at 68.

J&J first argues that Actavis cannot rely on these affirmative defenses since it is barred by its "unclean hands." The doctrine of unclean hands refers to "the fundamental principle that he who comes into equity must come with clean hands." Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000) (citation omitted). The doctrine

---

[10] J&J does not assert a claim of damages based on its lost profits.

turns on the issue of good faith, and in the trademark context, an "intention to confuse undermines any claim of good faith." Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 813 (2d Cir. 1999); see also Hermes, 219 F.3d at 107. While a finding that Actavis acted in bad faith in assisting the retailers to copy J&J's trade dress would preclude Actavis's reliance on its equitable defenses, genuine issues of fact remain as to Actavis's good faith.

J&J next asserts that it had no knowledge that the Actavis products were copying its Gold Mark until "shortly before" filing this lawsuit. Actavis points out that J&J is challenging more than fifty private label products made by Actavis over the past ten years for more than twenty retailers, and that it is simply not credible that J&J was unaware of the existence of so many products in the marketplace for such a length of time. J&J counters, however, that since 2001 Actavis has progressively expanded its copying of the Gold Mark, culminating in the introduction in 2005 of the CVS and Walgreens packages. As already noted, J&J focuses much of its attention in this litigation on sales by those two retailers.

Whether J&J's delay in filing suit was unreasonable depends at least in part on the success of its progressive encroachment argument, an issue upon which reasonable juries could differ.

Summary judgment is, therefore, inappropriate on each of
Actavis's affirmative defenses.

Conclusion

For the reasons stated above, J&J's motion for partial
summary judgment dated October 19, 2007 is denied with the
following exception: summary judgment is granted to J&J on
Actavis's functionality defense.

SO ORDERED:

Dated:    New York, New York
          February 21, 2008

DENISE COTE
United States District Judge